UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

BORN TO ROCK DESIGN INCORPORATED,

Plaintiff,

v.

CAFEPRESS.COM, INC.,

Defendant.

10-CV-8588 (CM) (JCF)
ECF Case

**BTR'S MEMORANDUM IN OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT**

Robert M. Kunstadt (RK-7230)
Ilaria Maggioni (IM-7220)
**R. KUNSTADT, P.C.**
875 Sixth Avenue, Suite 1800
New York, NY 10001
(212) 398-8881
mail@RKunstadtPC.com

*Attorneys for Plaintiff*
Born To Rock Design Incorporated

*TABLE OF CONTENTS*

I.   SUMMARY OF FACTS ........................................................................................ 1

II.  ARGUMENT .................................................................................................... 4

  A. CafePress' Declarations Are Inadmissible Under Rule 56(c)(2), F.R.Civ.P. ........... 4

  B. Some of CafePress' Infringing Goods are "Counterfeits" of Registered "Standard-Character" Trademarks Under the 1984 (Post-*Rolex*) Trademark Counterfeiting Act. 5

  C. CafePress as the Manufacturer, Seller, Shipper, and Promoter of Infringing Goods is a Kingpin Like Napster; Not an ISP or Search Engine ............................................. 8

  D. CafePress is "Passing-Off" on a Massive Automated Scale; the Polar-Opposite of a "Fair Use" ............................................................................................................... 13

  E. BORN TO ROCK is an Inherently-Distinctive and Presumptively-Valid Registered Trademark; CafePress' Prior Inconsistent Conduct Contradicts Its Affirmative Defense of "Descriptiveness" ............................................................................................. 14

  F. BTR's Established Trademark Rights Have Been Acknowledged by Sophisticated Traders Like Fox .................................................................................................. 21

  G. Having Infringed, CafePress Needs To Stay Well Back of the Line to Ensure Effective Relief ................................................................................................... 23

III. CONCLUSION ................................................................................................ 25

## *TABLE OF AUTHORITIES*

### Cases

*3 Point Distribution, LLC d/b/a Ezekiel, LLC v. CAFEPRESS.COM, INC.*, 2008 U.S. Dist. LEXIS 17128 *24 (CDCA 2008) (in Appendix of Exhibits, EXH. 25)...................... 21

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9 Cir. 2001).................................. 14

*Boim v. Holy Land Found.,* 511 F.3d 707 (7th Cir. 2007)................................................. 22

*Boston Athletic Ass'n, et al. v. Mark Sullivan, et al.*, 867 F.2d 22, 34-35 (1st Cir. 1989)  12

*CafePress.com, Inc. v. ArtsCafe.com et al.* (CD CA 07-cv-05657-ODW-JWJ............... 25

*Chevron Chem. Co. v. Voluntary Purchasing Group*, 659 F.2d 695, 705 (5th Cir. 1981), cert. denied, 457 U.S. 1126 (1982)............................................................................... 24

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32 (2003)................. 14

*Gucci America, Inc. v. Mindspring Entrs., Inc.,*135 F.Supp.2d 409 (SDNY 2001) ......... 10

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75 (2nd Cir. 1988) .................................. 19

*International Salt Co. v. United States*, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947)....................................................................................................................... 24

*Lorillard Tobacco Co. v. Hamden, Inc. d/b/a Downtown Check Cashing et al.*, 2011 WL 5024883 *5 (NDOH 2011) ........................................................................................ 10

*Louis Vuitton Mallettier S.A. v. Akanoc Solutions Inc.*, 2011 WL 4014320 (9th Cir. 2011) ............................................................................................................................ 10

*Montres Rolex, S.A. v. Snyder*, 718 F.2d 524 (2nd Cir. 1983) ....................................... 5, 6

*Tiffany (NJ) Inc. v. eBay Inc.*, 600 F. 3d 93 (2 Cir. 2010) ................................................ 9

*U.S. v. Jorge GUERRA et al.*, 293 F.3d 1279, 1288 (11th Cir. 2002) ............................... 6

### Statutes and Rules

15 U.S.C. §1127............................................................................................................... 5

Rule 56(c)(2), F.R.Civ.P. ................................................................................................. 4

### Other Authorities

*Cong. Rec.* at 31, 676 (1984) .......................................................................................... 6

*Macbeth*, Scene V .......................................................................................................... 17

*Trademark Manual of Examining Procedure (TMEP)* 904.04(b) ................................... 20

Plaintiff Born To Rock Design Incorporated ("BTR") submits this Memorandum in Opposition to Defendant CafePress.com, Inc.'s ("CafePress") Motion for Summary Judgment filed November 30, 2011. It is supported by BTR's Verified Counterstatement of Facts and the accompanying Appendix of Exhibits.

## I.  SUMMARY OF FACTS

This case is not in "virtual" reality. The goods are real, the people are real and the offending conduct is real and continuing. CafePress is not a "virtual online marketplace"; it is a real-world brick-and-mortar factory that produces infringing goods which it promotes and sells on the internet. (BTR Counterstatement, Par. 1).

BORN TO ROCK is not "descriptive" of guitars or t-shirts, the registered trademarked goods in issue. The goods guitars and t-shirts are inanimate objects that are not born and do not die. Since it takes thinking to ponder its possible connotations, it is only "suggestive" and hence inherently distinctive, registrable and enforceable as such. In contrast, "descriptive" terms like "warm", "loose fit" or "blue" have a defined meaning which is immediately understood without thinking. (BTR Counterstatement, Pars. 16, 27 and 30-32).

"Suggestive" terms like JUST DO IT are regularly used and registered as trademarks, without proof of secondary meaning having been acquired. (BTR Counterstatement, Par. 27).

CafePress itself registered CAFEPRESS as its trademark based on a "specimen of use" it submitted to the Trademark Office under oath, showing it used on the front of a

t-shirt -- so CafePress cannot be heard to argue that use of a trademark directly on the body of the goods (rather than on a "hangtag or label") is not a proper trademark use. It is a proper manner of use under applicable Trademark Office rules and practices. (BTR Counterstatement, Pars. 15 and 33-35).

BORN TO ROCK is a recognized brand that is enforceable on the basis of its established goodwill, even if it were not inherently distinctive (which it is). (BTR Counterstatement, Pars. 37-40).

Any reasonable person looking to start a line of BORN TO ROCK merchandise, would have seen BTR's pre-existing website www.BornToRock.com for guitars and t-shirts; and so would have foreseen a problem even without consulting an attorney or conducting a formal trademark search. Under the circumstances, those "second comers" may be presumed to have intended to infringe. (BTR Counterstatement, Par. 65).

CafePress' infringement of BORN TO ROCK happens because CafePress has pre-programmed its website to act that way. CafePress maintains a webpage for "Born To Rock Gifts" that uses "Born To Rock" prominently as an attention-getting device, i.e., a trademark; and a counterfeit one at that. (BTR Counterstatement, Pars. 18 and 54-58).

CafePress understates the scope of its infringement by omitting pictures of its counterfeit goods from its declarations, for example this one (BTR Counterstatement, Par. 11):



'Born to Rock' T-Shirt  $22
Light T-Shirt

Also available...

CafePress knows its website is rife with infringements. CafePress cannot deny this because it is reported in its SEC filings. BTR Counterstatement, Pars. 69 and 73-74; EXHS. 24 and 29). CafePress does not remove them because it benefits from their offer and sale. CafePress was put on notice by BTR but it persists anyway. (BTR Counterstatement, Pars. 5, 7, 10-11 and 53-59).

CafePress cannot deny that its offered goods are "related" goods to guitars because it offers them on its website under the heading of "Related searches" for guitar merchandise. (BTR Counterstatement, Pars. 46-50 and 55).

CafePress is not an "ISP" like AOL; it is not an auctioneer of used items like eBay; and it is not a search engine like Google. It manufactures, promotes, sells and ships infringing goods of its own manufacture; and refuses to stop without relief being ordered by this Court. (BTR Counterstatement, Pars. 1 and 59-63).

CafePress' two declarants are attorneys who do not demonstrate first-hand knowledge or competence on the subjects of their offered testimony. They were not on CafePress' list of trial witnesses in the Joint Pretrial Order filed November 30, 2011.

## II.  ARGUMENT

### A.  CafePress' Declarations Are Inadmissible Under Rule 56(c)(2), F.R.Civ.P.

Since CafePress' declarants Moore and Pietrini (its in-house and trial counsel, respectively) were not timely disclosed as witnesses for CafePress' case-in-chief in the Joint Pretrial Order filed November 30, 2011, they are precluded from testifying for CafePress at trial. Moreover, CafePress' attorney-declarants are not competent to testify about the intentions and motivations of either the developers of CafePress' automated infringement system; or of the various "Users" who take advantage of it to promote their infringing designs; or of any other third parties. These two attorneys do not demonstrate any first-hand knowledge of CafePress' business operations or the other subjects of their testimony, such as computer programming or alleged third-party use. (BTR's Counterstatement, Pars. 4, 14, 17, 18).

Their declarations deserve no weight since evidence on summary judgment must be of the type that is admissible at trial: "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Rule 56(c)(2), F.R.Civ.P. ***BTR makes that objection.*** By responding to CafePress' fact contentions, BTR does not waive its objection to the Moore and Pietrini declarations.

Especially on summary judgment, the failure of CafePress to offer testimony by its own responsible executives, highlights that the Court may and should infer that their testimony would be ***unfavorable*** to CafePress: imitating the example of Napster, they increase captive sales of "print-on-demand" goods by an automated system for poaching popular trademarks.

### B. Some of CafePress' Infringing Goods are "Counterfeits" of Registered "Standard-Character" Trademarks Under the 1984 (Post-*Rolex*) Trademark Counterfeiting Act

Lanham Act Section 1127 provides:

"A 'counterfeit' is a spurious mark which is ***identical with, or substantially indistinguishable*** from, a registered mark."15 U.S.C. §1127 (emphasis added).

CafePress' reliance on *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524 (2nd Cir. 1983) is misplaced because the rationale of that decision was to favor the trademark owner in case of deviation between the registration certificate and the actual goods, not *vice versa* -- so that counterfeiters cannot escape on a technicality (as CafePress wishes to do):

"To allow such differences to undercut the protection Congress intended to grant the trademark owner would be ***absurd***. *Cf. Ilco Corp. v. Ideal Security Hardware Corp.,* 527 F.2d 1221 (C.C.P.A.1976) (a mark may be modified in such a fashion as to retain its trademark impact and symbolize a single and continuing commercial impression; a change which does not alter the distinctive characteristics of a mark represents a continuity of trademark rights)." *Rolex,* 718 F.2d at 532 (2nd Cir. 1983).

The *Rolex* decision predates the Trademark Counterfeiting Act of 1984. The 1984 legislative history contradicts CafePress' reading of *Rolex*:

"Under both the criminal and civil definitions, the term 'counterfeit mark' refers to a mark or designation that is 'identical with or substantially indistinguishable from' a genuine mark or designation. ***The definition of 'substantially indistinguishable' will need to be elaborated on a case-by-case basis by the courts.*** See e.g., *Montres Rolex S.A. v. Snyder*, 718 F.2d 524, 530-32 (2d Cir. 1983), 104 S. Ct. 1594 (1984). ***Obviously, a mark need not be absolutely identical to be a genuine mark in order to be considered 'counterfeit.' Such an***

5

> ***interpretation would allow counterfeiters to escape liability by modifying the registered trademarks of their honest competitors in trivial ways.*** However, the sponsors do not intend to treat as counterfeiting what would formerly have been arguable, but not clear-cut, case of trademark infringement.
>
> For example, a manufacturer may adopt a mark for its goods that is reminiscent of, although certainly not 'substantially indistinguishable from,' a trademark used by the 'name-brand' manufacturer of the product. Thus, 'Prastimol' might be used as the mark for a medication that is the functional equivalent of a product sold under the trademark 'Mostimol.' 130 *Cong. Rec.* at 31, 676 (1984). http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm01709.htm (emphasis added).

The statute has been applied exactly that way: "There is no support for the proposition that in all cases, the trier of fact must determine indistinguishability based on the marks as affixed to the actual goods.*" U.S. v. Jorge GUERRA et al.*, 293 F.3d 1279, 1288 (11th Cir. 2002). CafePress would disregard the plain wording of the statute and would do so to exculpate the counterfeiter, which is exactly the opposite of the Second Circuit's expressed intention in *Rolex* to apply the statute flexibly to inculpate counterfeiters.

Moreover, the trademark in *Rolex* was a design mark: the shape of a watch crown. Hence, the exact shape was critical to defining the scope of the protected mark. But here, BORN TO ROCK is a ***word mark*** with a "standard-character" endorsement on the face of the registration certificate so that it expressly covers any font, style, size or color. (BTR Counterstatement, Pars. 28-29). *Rolex* is inapplicable and indeed to apply it here would contradict its express rationale to interpret the Lanham Act flexibly to better combat trademark counterfeiting, since any other approach would be "absurd". *Rolex*, 718 F.2d at 532. Both registrations of BORN TO ROCK issued with a "standard character" endorsement, which means that they are word marks, not design marks, and they cover the words in any font, style, size or color. Hence, the so-called "Unregistered

Logo" is irrelevant (CafePress' Alleged Fact No. 14). (BTR Counterstatement, Pars. 14 and 28-29).

Furthermore, CafePress misperceives the facts when it says that the logo on BTR's t-shirts is the only way the registered mark is used: it is also used in plain word format ("Born To Rock") on BTR's website (EXH. 9) and on invoices packed with the goods. (EXH. 27). Similarly, the infringing T-shirts offered for sale on CafePress' website use the form "BornTo Rock" both on the shirts and in plain word format below the image of the shirt offered for sale, just the way that the genuine T-shirt is offered for sale on BTR's website. (BTR Counterstatement, Par. 11; and EXHS. 13, 14, 15 and 19). Hence, CafePress' website is guilty of applying a spurious copy of the registered mark in connection with an online offering of the goods. (BTR Counterstatement, Par. 53). This is especially important now that websites play a major role in sales of counterfeit goods, which was not the case when *Rolex* was decided in 1983. Similarly when the mark is applied in lettering to the front of a shirt, since the logo border is no part of the registered mark; the spelling is identical (BORN TO ROCK); and the commercial impression is the same. (BTR Counterstatement, Par. 11; and EXH. 15). Unlike "Prastimol" v. "Mostimol", there is no substantial variation in many instances here. The remaining instances may not be counterfeits, but they are still infringements.

On February 25, 2011, the Court ordered CafePress to "provide to the [C]ourt and plaintiff's counsel the names of the individuals who created the content on Cafe Press that uses the 'Born to Rock' phrase"-- but CafePress provided ***no*** information about the individual(s) who created the counterfeit design on p. 3 above, and other designs brought to its attention by BTR. (BTR Counterstatement, Par. 75). By the limited selection of

designs it includes in its Statement of Alleged Facts (No. 12), CafePress obscures the distinction between designs that give rise to counterfeiting and infringement as an initial matter, like the one shown above; and other less blatant designs that may need to be enjoined as a remedial action to make sure the infringer stays well back of the line even if that imposes a disability as against honest competitors. (BTR Counterstatement, Par. 12) (see Section G below) .

### C. CafePress as the Manufacturer, Seller, Shipper, and Promoter of Infringing Goods is a Kingpin Like Napster; Not an ISP or Search Engine

If CafePress really were a "search engine" like Google (it is not), then when a user searches for a "BORN TO ROCK t-shirt" the user would be linked directly to BTR's webpage where the genuine BORN TO ROCK t-shirt is sold (EXH. 9); especially now that CafePress has been on notice for two years that BTR is the only genuine source. But CafePress only shows its own goods from its own captive owned-and-operated website www.cafepress.com. It is no more a "search engine" than the index of the *Sears Catalog* was a public library. When a user searches for a BORN TO ROCK t-shirt on CafePress, the search result should show nothing, since CafePress is not an authorized seller of BORN TO ROCK t-shirts. CafePress should not parrot-back the user's search query (which it admittedly does: CafePress' Alleged Fact No. 18) while displaying products and product-category hotlinks spuriously-labeled "Born To Rock". (BTR Counterstatement, Par. 53; EXH. 13).

The products that are displayed on CafePress' website, are displayed because they have been coded by CafePress to do that. For example, even the source code for a BORN TO ROCK FORCED TO WORK t-shirt, is encoded to display the title "Born To Rock T-Shirt" prominently on its webpage and on its browser tab. (EXH. 17). CafePress'

computer source code that causes the page to display is intentionally written to make that happen. CafePress has arranged it so that the infringement occurs. The "User" could not program the details of that computer source code, it was prepared by CafePress and resides on its server. That CafePress may have accepted its User's input unexamined by a human is not an excuse -- it is ***precisely the problem***. (BTR Counterstatement, Pars. 54-58).

Unlike eBay auctions or Google searches, CafePress directly profits from the promotion and sale of infringing products of its ***own manufacture***. (See CafePress' Alleged Fact No. 2 regarding its so-called "print-on-demand" production). In its Answer, CafePress asserted the statutory "innocent printer" defense (Answer, Par. 43). In the Pretrial Order, it dropped that defense. CafePress procures the goods, prints them, advertises and promotes them, takes orders and payment for them and ships them. The buyer using the CafePress website is making a purchase from "CafePress.com". At the end of the day, the "Shopkeepers" are effectively just freelance designers working for CafePress on commission. (BTR Counterstatement, Pars. 59-63; EXH. 22).

If eBay had been manufacturing the fake TIFFANY jewelry auctioned on its site intermixed with genuine jewelry, eBay would not have been excused. It was only excused because the fakes were made by others and listed on eBay's site without its knowledge and despite its efforts at prevention. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F. 3d 93 (2 Cir. 2010). CafePress will not prevent the infringements here; instead, it manufactures, promotes, ships, sells, collects payment for, and hence seeks to justify them (EXH. 22).

For CafePress to imply that it escapes responsibility for trademark infringement because it runs a big operation with lots of business (CafePress' Alleged Fact No. 3), would be like Macy's claiming it can't be bothered if it sells counterfeit RALPH LAUREN shirts because it has so many suppliers and products it is too hard to keep tabs on them all. There is no "too big to fail" exception to trademark infringement. Even an "ISP" can be held liable, contrary to CafePress' claim of ISP immunity. *Louis Vuitton Mallettier S.A. v. Akanoc Solutions Inc.*, 2011 WL 4014320 (9th Cir. 2011); *Gucci America, Inc. v. Mindspring Entrs., Inc.,* 135 F.Supp.2d 409 (SDNY 2001). CafePress is not an ISP anyway, since it makes, promotes, sells, and ships the goods. Indeed, counterfeiting is a strict liability tort. *Lorillard Tobacco Co. v. Hamden, Inc. d/b/a Downtown Check Cashing et al.*, 2011 WL 5024883 *5 (NDOH 2011) ("Because sellers bear strict liability for violations of the Lanham Act, even dealers who are ignorant that they are selling goods bearing an infringing mark are liable for trademark infringement. Defendant's claims of ignorance as to the counterfeit cigarettes are, therefore, irrelevant to the issue of liability. The statute merely requires that the Defendant 'used' the goods in commerce, which occurred when the cigarettes were offered for sale.") (internal citations omitted)).

CafePress' contribution to the printing art is to have realized that new technology for computerized "print-on-demand" instant printing can be applied to eliminate an inventory of infringing merchandise. (CafePress' Alleged Fact No. 2). That way, there is no expensive inventory of infringing goods to be seized in a raid. This minimizes the risk of financial loss and incentivizes CafePress to "fully automate" the process, including

skipping the step of conducting trademark searches on the images submitted by its freelance designers.

That cost is palmed off on the IP owners: CafePress admittedly refuses to stop itself from infringing, unless and until the complainant identifies each new infringement precisely by stock number. (CafePress' Alleged Fact No. 6). CafePress acts as if its right hand (its legal department) does not know what its left hand (its print shop) is doing. CafePress does this under the guise of pretending that it is like eBay, which does not make, handle, print, ship or even possess the third-party items that it auctions. Hence, CafePress has positioned itself to become the "Napster" for trademarks, unless restrained by this Court.

CafePress seeks to portray its freelance designers as innocent of any bad intent, but CafePress provides no competent evidence from them. Neither of its attorney-declarants can offer anything but speculation about the designers' motives. But on a summary judgment motion, the inferences point to the contrary: since they all had immediate online access to BTR's www.BornToRock.com website displaying its BORN TO ROCK guitars and t-shirts, one must presume that they intended to copy. (BTR Counterstatement, Par. 65).

This inference is compelling since CafePress certainly has access to its designers and could have deposed them in discovery (it is too late for CafePress to furnish their testimony now, since none of them are on CafePress' witness list). Hence, it is impossible for CafePress to establish non-infringement by motion:

> "In the present case, we adopt a similar presumption. Given the undisputed facts that (1) defendants intentionally referred to the Boston Marathon on its shirts, and (2) purchasers were likely to buy the shirts precisely because of that reference, we think it fair to presume that purchasers are likely to be confused about the shirt's

source or sponsorship. We presume that, at the least, a sufficient number of purchasers would be likely to assume—mistakenly—that defendants' shirts had some connection with the official sponsors of the Boston Marathon. In the absence of any evidence that effectively rebuts this presumption of a 'likelihood of confusion,' we hold that plaintiffs are entitled to enjoin the manufacture and sale of defendants' shirts.

\* \* \* \*

[T]he Second Circuit has held that when there is intentional copying of a product's trade dress, 'the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded.' <u>Perfect Fit Indus., Inc. v. Acme Quilting Co., 618 F.2d 950, 954 (2d Cir.1980)</u> (citations omitted)." *Boston Athletic Ass'n, et al. v. Mark Sullivan, et al.*, 867 F.2d 22, 34-35 (1st Cir. 1989).

The Court must infer that CafePress' freelance designers intended to profit from BTR's goodwill. Anyone who is thinking about launching a line of BORN TO ROCK merchandise, would first look at www.BornToRock.com if they have any common sense (let alone a shred of integrity). They immediately see it is a website for guitars, music software and accessories, including picks and t-shirts. (EXH. 9). So you don't even have to run a trademark search or consult a lawyer to see an immediate problem. On summary judgment, where all disputed facts must be resolved in the non-movant's favor, it is established that CafePress' designers must have had bad intent. Since CafePress is in privity and contract with them as their promoter, manufacturer, shipper and licensee, CafePress is ascribed the same bad intent.

CafePress maintains that its Users do not place trademark matter on their products. However, its "Users" are being provided ***royalties*** under their "Content Owner Agreement" with CafePress. Hence, there is no basis for CafePress to make a blanket hearsay claim that its "Users" don't wish to assert trademark rights in what they perceive to be "their" content. (BTR Counterstatement, Par. 66).

Indeed, CafePress itself takes a license to the designs, so that CafePress can sell them for its own account in its "Marketplace". When the "design" comprises a few words printed on a shirt with minimal additional matter (like the common basic shape of a star that is not copyrightable), the only such proprietary right that could be licensed for royalties is a ***trademark***. Hence, CafePress' claim that wording placed on merchandise on its site cannot be the intended (infringing) trademarks of its Users, contradicts the sense of its own agreements with them. (BTR Counterstatement, Par. 67).

**D. CafePress is "Passing-Off" on a Massive Automated Scale; the Polar-Opposite of a "Fair Use"**

Viewed in the light most favorable to BTR as it must be on summary judgment, CafePress' Moore Declaration (Par. 14) shows that CafePress knows full well that its website has been programmed to misuse trademarks by turning them into page titles, headers and subheaders, but it does not care -- and does not intend to stop doing it.

When a Google search on "Born To Rock t-shirt" returns results, they mean that Google has found something potentially relevant at a ***third-party*** website. But when CafePress' internal search of its own website not only returns results, but actually echoes back "Born To Rock T-shirts & Tees" repeatedly in CafePress' own webpage titles, headers and sub-headers, CafePress is representing that it has such t-shirts for sale at its ***own*** website. (BTR Counterstatement, Pars. 51-58). CafePress makes it look like BTR has set up shop as a "Shopkeeper" on www.CafePress.com; or that CafePress operates a "portal" featuring BTR's goods.

Hence, what CafePress admittedly has done by its computerized echo-back system is to ***automate the process of "passing off"***. Passing off is being performed quickly and cheaply by a pre-programmed automaton, rather than by a human sales-clerk.

Rather than being an exculpation, it is an aggravation of the offense: trademarks are being abused with previously-unattainable automated efficiency.

The resulting trademark infringement is so flagrant that when you search for "Pepsi-Cola t-shirts", CafePress displays Coca-Cola t-shirts as "Pepsi-Cola T-Shirts & Tees". (BTR Counterstatement, Par. 52).There is no more blatant a textbook example of "passing-off", than to serve up Coca-Cola when the customer wants Pepsi-Cola. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32 (2003) ("Section 43(a) of the Lanham Act prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill. It forbids, for example, the Coca-Cola Company's passing off its product as Pepsi-Cola or reverse passing off Pepsi-Cola as its product."). CafePress' entire website represents a mass tort in progress. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9 Cir. 2001). Until CafePress can get its act together and its head in the right place, its servers need to be shut down in the public interest.

### E. BORN TO ROCK is an Inherently-Distinctive and Presumptively-Valid Registered Trademark; CafePress' Prior Inconsistent Conduct Contradicts Its Affirmative Defense of "Descriptiveness"

CafePress has assumed an impossible burden on its motion. Reg. No. 1,846,682 BORN TO ROCK for guitars is incontestably and hence ***conclusively*** presumed to be valid and distinctive and to enjoy secondary meaning pointing exclusively to BTR as its source of origin. Reg. No. 3,843,978 BORN TO ROCK for t-shirts is presumed to be valid and distinctive and to enjoy secondary meaning pointing exclusively to BTR as its source of origin. How could anyone reasonably have expected to overcome those heavy presumptions summarily when the evidence is as strongly in the trademark owner's favor

as it is here? If anything, summary judgment could be entered ***against*** CafePress on this evidence.

The "carry-over" of secondary meaning from the incontestable registration to the newer one, is compelling. The very same consumers who ***conclusively*** know that BORN TO ROCK is a brand of guitar, not a "description" of a guitar, have to realize that BORN TO ROCK is a brand of t-shirt, too -- because t-shirts are frequently sold as promotional items in the musical field, as evidenced by CafePress's own webpages linking BORN TO ROCK merchandise with the topics of guitars and music (EXHS. 13, 15 and 18); and exemplary trademark registrations for t-shirts by the bands VOIVOD and SUICIDAL TENDENCIES (EXH. 8). (BTR Counterstatement, Pars. 42, 49-50, 55 and 64). Hence, the trademark examiner was factually and legally correct to grant a registration of BORN TO ROCK as a distinctive trademark for t-shirts, based on its prior registration and use by BTR as an incontestable trademark for a brand of guitars.

If CafePress says in reply that its disparate items all show up in its search results because its "Users" have classified them as falling under the keywords "Born to Rock", that indicates BORN TO ROCK really does not have any defined "descriptive" meaning. There is no common thread that persists in and unifies all those items, in the way that the descriptive term "energy-saver" always means to save energy. BORN TO ROCK is just a suggestive phrase that connotes (suggests) different kinds of imagery to different people. (BTR Counterstatement, Pars. 4 and 30-32).

Tellingly, CafePress did not counterclaim in its Answer to cancel BTR's trademark registrations as invalidly descriptive; it only hatched that argument now. It did not have sufficient confidence in its "descriptiveness" theory to cross that bridge when

filing its Answer. Indeed, the older registration is incontestable and conclusively valid so it could not be cancelled except upon the impossible showing that BORN TO ROCK has become the "generic name" for the goods guitars. The newer registration is not yet incontestable so it is presumed valid, but not yet conclusively valid. But CafePress did not dare counterclaim to cancel it, either; so validity is not properly in issue and cancellation is off the table. (BTR Counterstatement, Pars. 28-29).

CafePress is only now trying to excuse its infringement of these validly-registered marks by claiming as an ***affirmative defense*** (on which it bears the burden) that it does not use them in their capacity as trademarks, but rather only in a "descriptive" manner. Hence, CafePress types the words "born to rock" in small letters in its brief and declarations -- contrary to how they usually are presented on CafePress' goods and on its website -- to give the impression that it uses these words like a journalist might use them metaphorically in the body of an artist's biography. (BTR Counterstatement, Pars. 4 and 16). But CafePress is not a disinterested journalist exercising a First-Amendment right to English words in news copy: CafePress uses the capitalized forms BORN TO ROCK and "Born To Rock" as a prominent attention-getting device to draw interest to its own goods offered for sale on its competitive commercial website. (EXHS. 13 - 14 and 17 - 19). That is a classic trademark use, not a fair descriptive use. CafePress admits as much. (EXH. 22, quoted at p. 21 below).

CafePress asserts that BORN TO ROCK must be "descriptive" because it evokes a "feeling" (e.g., CafePress Memo, p. 13). CafePress does not explain straight out what that feeling is; since it is so vague, no one can definitively say what it could be. CafePress' Memo speculates that it may mean one thing to one person, but something else

to another. The precise meaning of even the designation ROCK -- as in "rock and roll music" -- is elusive; some might say it is just "sound and fury, signifying nothing" (*Macbeth*, Scene V).

Guitars and t-shirts are inanimate objects. They are not born and they do not die. As applied to the registered inanimate goods "guitars" and "t-shirts", BORN TO ROCK is just an incongruous phrase with a nice ring to it. BORN TO ROCK cannot be "descriptive" of them. It takes a mental reasoning process to determine the sense in which BORN TO ROCK might apply metaphorically. There is not just one way, since no one really knows what BORN TO ROCK means -- even when applied to a person. ROCK, like JAZZ, is a slippery concept. Said of a person, "born to rock" may mean you are talented as a musician. It may mean you are irresponsible or carefree. It may mean you are hip. It may mean you are rude (as in "punk rock"). (BTR Counterstatement, Pars. 30-32).

So if you take a phrase that is inherently vague, and then apply it to something else entirely, unpredictable connotations may be evoked that may or may not be correct. The shirt is not a talented musician. The guitar is not carefree. It may mean one thing to one person, something else to another, and nothing very informative at all to a third. That is not what a descriptive term does. If you say "blue", "loose fit", "open weave" or "short-sleeved", we all know what you mean. (BTR Counterstatement, Par. 16). Those are descriptive terms for t-shirts. Hence, when drawing the line between "descriptive" and "suggestive", BORN TO ROCK fits comfortably on the suggestive side of the line:

| Fanciful Trademarks | XEROX,  SUPERCALIFRAGILISTIC |
|---|---|
| Arbitrary Trademarks | APPLE,  STARBUCKS |
| Suggestive Trademarks | BORN TO ROCK,  JUST DO IT |

| Descriptive Terms | loose fit,  open weave |
|---|---|
| Generic Names | t-shirt,  tee |

Having a connotation or evoking a "feeling" is not inconsistent with trademark status; there is no requirement that all trademarks be coined nonsense-words like XEROX. Suggestive trademarks like JUST DO IT, GOIN' TO MY HAPPY PLACE and LEAVE NOTHING are also inherently distinctive and hence perfectly valid and enforceable without need for proof of acquired "secondary meaning". (EXHS. 4 and 6) (BTR Counterstatement, Par. 27). CafePress' declarant Pietrini even applied-for and registered SUICIDAL TENDENCIES as a band's trademark for t-shirts (EXH. 8); that trademark definitely evokes a "feeling". CafePress' "feelings" theory deserves no credit since it contradicts its own proponent's demonstrated prior practice.

  CafePress' strained "descriptiveness" argument would corrode established concepts of trademark rights at their core. If evoking a "feeling" sufficed to defeat a trademark's enforceability due to "descriptiveness", then NIKE would be unenforceable for running shoes: it evokes a feeling of "victory" since NIKE is the goddess of victory. Considering that a cognizable descriptiveness defense applies as a matter of law against even the most famous trademarks, it is no counter-argument that NIKE may be more famous than BORN TO ROCK.

  The Second Circuit held that a toy manufacturer's unregistered mark GUNG-HO used on toy action figures was suggestive, rather than descriptive, and hence protectable as a trademark. During World War II, the Marines adopted it as an expression of "can-do" attitude. The Court explained:

  "The critical legal distinction is that the mark 'GUNG–HO' may describe elements of the personality attributed to the toy, as well as other toys, without describing the particular toy itself or its differentiating qualities. Connecting the

18

fantasy personality to the toy action figure requires imagination. And, quite simply, it is this need to resort to imagination that renders 'GUNG–HO' suggestive rather than descriptive." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75 (2nd Cir. 1988).

In the case of BORN TO ROCK, parsing any independently-generated "feeling" requires even more creative imagination. Mentally pondering diverse implications of an alleged BORN TO ROCK "feeling" (such as they may variously be formulated consequent upon individual internal deliberations involving particularized emotional input) in order to try to ascribe them metaphorically to inanimate guitars and t-shirts, takes at least as much (if not more) imagination than ascribing the known and concrete attributes of a GUNG-HO "personality" to toy soldiers.

Certainly to say that BORN TO ROCK must describe the t-shirt because it says BORN TO ROCK on it, is pure tautology. You might as well say that there is a descriptive category of shirt called "NIKE shirts", because they say NIKE on them; and another descriptive category of shirt called "THE NORTH FACE shirts" because they say THE NORTH FACE on them; and so on. (BTR Counterstatement, Par. 27).

Truly "descriptive" terms can be used in the comparative and superlative, e.g., "warm", "warmer", "warmest" in connection with clothing. But it makes no sense to say "BORN TO ROCK-ier", "BORN TO ROCK-iest"; or even "more BORN TO ROCK", or "most BORN TO ROCK". In all the years since BTR first adopted the trademark BORN TO ROCK, it has never been used that way by anyone. It is not used that way on CafePress' website or in its evidence on this motion. The very idea would be silly, because BORN TO ROCK just evokes an unquantifiable *"Je n'sais quoi"* which makes it apt as an inherently-distinctive trademark like GUNG-HO, not a descriptive term like "warm". (BTR Counterstatement, Par. 30). CafePress' own registration of WHAT'S

YOUR PASSION? contradicts its contention that such phrases are unregistrable descriptive matter. (EXH. 20).

For CafePress to display a whole webpage of shirts under the prominent header "Born To Rock T-Shirts & Tees" (EXH. 14), exemplifies its misuse of the registered trademark. CafePress even depicts its goods as part of a "Born To Rock Collection" (EXH. 13) (BTR Counterstatement, Pars. 44-46). Use of BORN TO ROCK as a prominent attention-getting headline, and in the name of a "Collection", is trademark use in two of its classic forms. It is far removed from fair descriptive use, as in the text of a hypothetical article in *Rolling Stone* magazine that might be reporting Mick Jagger to have been a great singer who could be said to have been "born to rock".  That is what the Lanham Act immunizes as fair descriptive use. (EXH. 22, quoted at p. 21 below).

The Trademark Office's *Trademark Manual of Examining Procedure* (*TMEP*) provides that the use of the mark on the body of a product is a proper trademark use:

> "The trademark may be imprinted in the body of the goods, as with metal stamping; it may be applied by a rubber stamp; or it may be inked on by using a stencil or template." *TMEP* 904.04(b).

The trademark is applied to the body of the genuine BORN TO ROCK t-shirts by inking it on with a silkscreen stencil. (BTR Counterstatement, Par. 15).

CafePress' insistence that a trademark can only be applied to a hangtag or label, not directly to the goods, is erroneous. CafePress (as well as third-parties) submit "specimens of use" to the Trademark Office that show words printed directly on t-shirts – not on hangtags or labels. (BTR Counterstatement, Pars. 15 and 33-35). CafePress' pre-suit conduct is more persuasive than its current contrary protestations. If CafePress were to prevail, it would be nullifying its own registered marks and contradicting its own

representations to the Trademark Office in support of its registrations. On summary

judgment, CafePress' pre-suit conduct has to be given precedence.

CafePress' anti-trademark theory of "ornamentation" now asserted on summary

judgment is inconsistent with CafePress' prior legal action against Arts Cafe to

enforce the CAFEPRESS trademark -- which is also displayed on the front of t-shirts

(BTR Counterstatement, Pars. 34 and 68). Especially on summary judgment, CafePress'

pre-suit actions speak louder than *post hoc* rationalizations.

CafePress' defense theories are unsustainable since they contradict what it tells its

own "Users":

> **Examples of Prohibited Content** … NO use of trademarks, names, or logos of
> companies.
> **Is it Fair Use?** Usually not, fair use of a work for merchandise is treated very
> differently than for use for informative purposes or for commentary.
> (EXH. 22; BTR Counterstatement, Par. 64).

CafePress was preliminarily enjoined from trademark infringement by Judge

Guilford in Los Angeles, in a decision rejecting its "fair use" and "descriptiveness"

defenses. *3 Point Distribution, LLC d/b/a Ezekiel, LLC v. CAFEPRESS.COM, INC.*, 2008

U.S. Dist. LEXIS 17128 *24 (CDCA 2008) (EXH. 25) (BTR Counterstatement, Par. 70).

### F.  BTR's Established Trademark Rights Have Been Acknowledged by Sophisticated Traders Like Fox

CafePress ignores BTR's successful record of enforcing its mark against

prominent businesses fully capable to defend themselves against BTR. For example,

CafePress complains about seeing third-party BART SIMPSON BORN TO ROCK

merchandise. Fox is the owner of the BART SIMPSON mark. Fox apologized for selling

BORN TO ROCK merchandise and discontinued it. Anything CafePress sees still posted about it is just an orphan webpage. The merchandise itself is discontinued. (BTR Counterstatement, Par. 41).

If BORN TO ROCK really were "descriptive", Fox would not have yielded to BTR and apologized. Fox is a sophisticated licensing organization with legal counsel and business executives knowledgeable about trademarks and merchandising. It is not as if Fox cannot afford to litigate against a smaller company like BTR. Responsible companies correct their conduct when necessary. CafePress, in contrast, tries to rationalize its way out.

BORN TO ROCK as a brand is recognized in trade directories, guitar handbooks, music magazines, third-party websites and blogs in the U.S. and around the world. BTR's assignor of European Community trademark rights (BigTimeTV) conducted an extensively-publicized series of BORN TO ROCK guitar exhibitions and an international eBay charity auction involving prominent U.S. celebrities such as Diane von Furstenberg and Jennifer Lopez. BTR receives unsolicited inquiries about its products in view of their use by musicians such as VOIVOD, whose bass-player Jason Newsted was originally in METALLICA. In view of that evidence, it is established on this motion that BORN TO ROCK enjoys secondary meaning not just due to its Federal Registrations, but also *de facto*. Hence, even if it were descriptive (it is not), CafePress' motion is futile. (BTR Counterstatement, Pars. 37-40).

CafePress submits purported evidence of third-party use of BORN TO ROCK. However, from hearsay internet printouts it is not possible to tell who really stands behind them. *Boim v. Holy Land Found.,* 511 F.3d 707 (7th Cir. 2007).  A lot of it looks

like the merchandise sold by CafePress. The Court may infer that the same persons in
privity with CafePress, also offer their infringements elsewhere. (BTR Counterstatement,
Par. 17).

That others may infringe BORN TO ROCK, does not excuse CafePress. If the
existence of other infringers would bar relief, hardly any trademark owner could get relief
nowadays. While others may offer infringing BORN TO ROCK clothing for now,
judgment against CafePress and others "acting in concert and privity with it", together
with the requested corrective advertising, should put a stop to them. Word will spread
among infringers that it is not a good idea to mess with BTR's trademarks. (BTR
Counterstatement, Par. 17).

### G. Having Infringed, CafePress Needs To Stay Well Back of the Line to Ensure Effective Relief

CafePress overlooks that the relief sought by BTR is premised in part upon
CafePress' effectively-admitted infringement. (CafePress' Alleged Fact No. 11). It has
been two years since CafePress was first warned, but the problem persists since by the
nature of CafePress' recklessly-designed business plan, items admittedly come and go
without effective supervision. CafePress tries to fault BTR for not identifying CafePress'
products by number (e.g., CafePress' Alleged Fact No. 5), only because CafePress is
loath to scrutinize the products of its own hand. But CafePress is in the best position to do
so *before they cause harm*, not after. (BTR Counterstatement, Par. 77). CafePress'
disregard for trademark rights not only harms BTR and other trademark owners, but it
unfairly disadvantages CafePress' honest competitors who take steps not to infringe:
CafePress can undercut their prices and attract more business by its "Viral network

effect". (BTR Counterstatement, Par. 71). CafePress leads a race to the bottom, unless and until it is restrained by application of the law against unfair competition.

The scope of relief is necessarily broader than the scope of infringement. A protective cordon may be established as part of the injunctive relief necessary to remedy infringement; and to prevent recurrence and repeated re-litigation due to creative attempts at evasion by CafePress and its "Users" in privity with it. Hence, even variations of the mark, and uses on less-immediately related products, may be within the scope of the needed and ordered relief:

> "A competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line...." *Chevron Chem. Co. v. Voluntary Purchasing Group*, 659 F.2d 695, 705 (5th Cir. 1981), cert. denied, 457 U.S. 1126 (1982).

> "[I]t is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." *International Salt Co. v. United States*, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947).

CafePress obscures the distinction between designs that give rise to infringement as an initial matter, like the counterfeit on p. 3 above, and other less blatant designs that need to be enjoined as a remedial action to make sure that infringers like CafePress stay well back of the line (even if that imposes a disability as against honest competitors). (BTR Counterstatement, Par. 16).

BTR seeks statutory damages, costs and attorneys' fees; as well as injunctive relief, corrective advertising, and delivery to BTR for destruction of infringing goods and instrumentalities. The relief requested by BTR is the customary relief sought in trademark cases such as this, where irreparable injury is caused by mass-sale of unauthorized infringing merchandise, including t-shirts. In a case brought by CafePress against its competitor Arts Cafe, CafePress asserted trademark registrations of

CAFEPRESS (including on the front of t-shirts as it now alleges is not trademark use), admitted that it provides content itself in addition to the content provided by its users, and requested injunctive relief against Arts Cafe (*CafePress.com, Inc. v. ArtsCafe.com et al.* (CD CA 07-cv-05657-ODW-JWJ) (see Complaint, Pars. 7-8; and Prayer for Relief, Par. 2). (EXH. 23). CafePress may now be ordered to act towards others, as CafePress wishes others to act towards it.

### III. CONCLUSION

The Lanham Act permits no online harbor for trademark infringement. The conclusion on this summary record is that CafePress counterfeits and infringes registered trademarks like BORN TO ROCK by making, promoting, shipping and selling the goods. The mantle of eBay and Google does not fit since CafePress is the kingpin.

Respectfully submitted,

Dated: December 13, 2011

R. KUNSTADT, P.C.

/IXM

By: _____
Robert M. Kunstadt (RK-7230)
Ilaria Maggioni (IM-7220)
875 Sixth Avenue, Suite 1800
New York, NY 10001
(212) 398-8881
mail@RKunstadtPC.com
***Attorneys for Plaintiff***
Born To Rock Design Incorporated